IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

TONYA D. WAKHAM,

      Plaintiff,

v.                                  CASE NO. 2:08-cv-0827

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

    This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are the parties' cross-motions for judgment on the pleadings.

    Plaintiff, Tonya D. Wakham (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on September 16, 2004, alleging disability as of July 29, 2001, due to back problems, bulging discs, pain, numbness of the right leg, panic attacks, and depression.  (Tr. at 14, 61-63, 64-66, 75-82, 83-85.)  The claims were denied initially and upon reconsideration.  (Tr. at

14, 38-40, 47-49.)  On January 3, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 50.) The hearing was held on April 3, 2007 before the Honorable Andrew J. Chwalibog.  (Tr. at 28, 400-416.)  By decision dated August 7, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 14-27.)  The ALJ's decision became the final decision of the Commissioner on April 10, 2008, when the Appeals Council denied Claimant's request for review.  (Tr. at 6-9.)  On June 10, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574

3

(4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 16.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of discogenic disc disease of the lumbar spine and seizure disorder.  (Tr. at 16.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 19.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 20.)  As a result, Claimant cannot return to her past relevant work.  (Tr. at 25.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as office helper, counter attendant, order clerk, and receptionist, which exist in significant numbers in the national economy.  (Tr. at 26.)  On this basis, benefits were denied.  (Tr. at 27.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less

4

than a preponderance. If there is evidence to
justify a refusal to direct a verdict were the
case before a jury, then there is 'substantial
evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting
Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).
Additionally, the Commissioner, not the court, is charged with
resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d
1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not
abdicate their traditional functions; they cannot escape their duty
to scrutinize the record as a whole to determine whether the
conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d
396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the
Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was forty-one years old at the time of the
administrative hearing.  (Tr. at 404.)  She graduated from high
school where she was placed in regular education classes and
received average grades.  (Tr. at 221, 405.)  She has an
Associate's degree in Radiology.  (Tr. at 405.)  In the past, she
worked as a radiologic technologist for thirteen years, and as an
ultrasound technician for nine months.  (Tr. at 222, 406.)

The Medical Record

The court has reviewed all evidence of record, including the
medical evidence of record, and will summarize it briefly below.

5

Physical Evidence

On November 12, 1998, Claimant was treated at Appalachian Regional Healthcare ("ARH") for back pain.  (Tr. at 139.)

On November 30, 1998, Claimant was treated at ARH, for a low back injury she "sustained on November 7, 1998, when she was lifting a nuclear generator that weighs about 50 pounds."  (Tr. at 136.) Prakob Srichai, M.D., stated that a CT scan showed "posterior bulging of the annulus of L4-L5 and somewhat extrinsic to the left side with mild spondylolysis of the L4-L5 facet." (Id.)  Dr. Srichai's treatment plan was for a course of twenty physical therapy treatments, and a continuation of her current medications of Naprosyn 500 mg. and Flexeril 10 mg. (Id.)

ARH Physical Therapy Progress Notes dated December 2, 1998 through February 15, 1999, show Claimant received sixteen treatments related to back pain, pain management, and lifting techniques.  (Tr. at 130-35.)

On June 18, 2000, Claimant sought treatment at ARH Emergency Room ("ER").  Claimant was diagnosed with acute low back strain. She was discharged with pain medications.  (Tr. at 128-29.)

On June 27, 2000, October 17, 2000, and May 3, 2002, Claimant was treated by Dr. Bofill.  (Tr. at 193-94.)   Treatment notes indicate Claimant injured her back at work on June 12, 2000, while lifting a patient.  Dr. Bofill diagnosed chronic back syndrome and chronic anxiety.  He prescribed Ultram, Flexeril, Fiorecet, Xanax,

6

and Ambien, with multiple refills.  (Tr. at 193-94.)

On May 22, 2002, Claimant was treated at Community Health Foundation Clinic ("CHFC").  Tomas Vigo, M.D. diagnosed Claimant with chronic low back pain and bulging disc at L5-S1.  He advised Claimant to avoid heavy lifting and return as needed.  (Tr. at 188.)

On June 13, 2002, Mahesh M. Koppikar, M.D., provided a radiology report of Claimant's MRI of the lumbar spine to Rano S. Bofill, M.D.  (Tr. at 195-96.)  Dr. Koppikar's impression:

> Focal fatty changes involving the superior end plate
> posterior column of L4.  Dehydrated, degenerated disc at
> L5-S1 level with primary indentation of ventral border of
> the thecal sac and displacement of nerve root sleaves due
> to grade I retrolisthes of S1 on L5.  No significant
> contribution by herniated or bulging disc.  A report of
> a lumbar spine CT of 11-13-98 was reviewed.  The films
> were not available for review.

(Tr. at 195, 330.)

On June 19, 2002, Claimant was treated at CHFC for complaints of "chronic low back pain due to lumbar sprain, bulging disc at L5-S1 and insomnia." (Tr. at 186.)  Dr. Vigo found no swelling or deformity in the lumbar range.  He ordered a TENS unit, advised her to avoid heavy lifting, and to return in ninety days.  (Id.)

On December 18, 2002, Panos Ignatiadis, M.D. evaluated Claimant and provided a report to Dr. Vigo.  He stated:

> If indeed her pain has improved then she may either
> discontinue her brace or use it while she is working in
> the capacity that she did before.  On the other hand if
> she is unable to perform her duties of radiology
> technician for which she has trained then she may go

7

> through a functional capacity to establish what else she
> can do.  As a last resort, indeed if her pain itself is
> interfering with her lifestyle and everything else has
> failed and she is not keen on continuing on prescription
> medication for pain control then she may be a candidate
> for an interbody fusion at L/5 S/1 which is the treatment
> of choice which has a batting average of improvement of
> 85% but there is a chance that she may not improve... I
> consider her symptoms related to the accident of 6-12-00.
> I consider that she is still symptomatic and
> incapacitated and hence I feel that treatment should be
> instituted as I mentioned and I hope that the fund will
> approve it.

(Tr. at 333.)

On May 4, 2004, Claimant was admitted to St. Mary's Medical Center ("St. Mary's") with complaints of low back pain and was diagnosed with a low back strain.  (Tr. at 156-58.)  David Caraway, M.D., performed a fluoroscopically guided, right-sided, L5-S1, transforaminal epidural steroid injection, which Claimant tolerated well without complications.  (Tr. at 158.) Claimant also had the procedure on March 30, 2004, and February 17, 2004.  (Tr. at 162-63, 336.)   On December 10, 2003, Dr. Caraway first evaluated Claimant at Dr. Vigo's request.  He found: "In summary, this is a patient with a clinical picture of right-sided, L5-S1 radicular pain.  This is consistent with her MRI findings."  (Tr. at 340.)

On August 2, 2004, Dr. Caraway evaluated Claimant during a routine followup.  He stated that Claimant had completed a complete series of right-sided transforaminal injections with only temporary relief of her pain.  Dr. Caraway stated:

> She wants to have a second opinion...I think that this is
> completely reasonable.  I also think that an EMG may be

8

indicated to document any significant nerve damage.
Otherwise, we will continue her on her current
medication, which is Lortab 4 times daily. I have told
her this is the maximum dose of Lortab that I would
recommend.

(Tr. at 159.)

On October 18, 2004, Rano S. Bofill, M.D., completed a
"Routine Abstract Form - Physical" for the West Virginia Disability
Determination Service. (Tr. at 189-92.) On the form, Dr. Bofill
checked that Claimant's vision, hearing, speech, musculoskeletal,
respiratory, cardiovascular, and digestive, were "normal." (Tr. at
190-91.) He noted Claimant's diagnoses were "chronic back
syndrome, chronic anxiety" and "[p]atient seen by Dr. Joseph Grady
and has recommended the remaining 3% impairment of the whole person
for Workers' Compensation claim." (Tr. at 191.)

On November 10, 2004, Bruce A. Guberman, M.D., examined
Claimant in regard to her West Virginia Workers' Compensation
claims. (Tr. at 197-202.) He noted that for her back injury of
June 12, 2000, Claimant received a 3% impairment rating. (Tr. at
198.) He noted Claimant also had a work-related back injury on
November 7, 1998, for which she received a 5% impairment rating.
(Tr. at 198.) He recommended that Claimant receive an additional
9-12% impairment rating for the injury of June 12, 2000. (Tr. at
202.)

On November 11, 2004, Eli Rubenstein, M.D., provided an x-ray
report for Dr. Guberman regarding Claimant's lumbar spine. He

9

found "[t]here is a marked forward displacement of L5 on S1 with a marked appendicular defect at L5 and S1.  The forward displacement measures approximately 5mms.  The rest of the interspaces are normal.  There is no compression fracture... Impression: Stage III, Spondylolisthesis L5 on S1.  Degree of mobility is limited."  (Tr. at 203.)

On November 24, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFC") and opined that Claimant could perform light work with the ability to occasionally climb, balance, stoop, kneel, crouch, and crawl.  The evaluator found no manipulative, visual, or communicative limitations.  Environmental limitations were unlimited except to avoid extreme cold and heat, vibration, and hazards.  (Tr. at 212-19.)  The evaluator, Felipo R. Frangutti, M.D. noted:

> [p]atient is credible, allegations are supported by findings...normal gait...strength and tone: normal...all considered including functional limitations which affect not too significant.  RFD reduced to light.  The severity and duration of symptoms appears to be magnified in view of ROM [range of motion] of lumbar spine, normal gait, etc.

(Tr. at 217.)

On January 8, 2005, Torin Walter, M.D., interpreted Claimant's MRI lumbar spine without contrast.  He found: "There is narrowing at the L5-S1 level on the right, and likely disc and hypertrophic facet affecting the exiting L5 nerve root.  Again, there is mild anterolisthesis at this level and this might be further evaluated

10

with flexion and extension views." (Tr. at 395.)

On February 11, 2005, Panos Ignatiadis, M.D., evaluated Claimant at the request of Dr. Caraway, and concluded Claimant's MRI showed evidence of decreased disc height at L/5 S/1 and spondylolisthesis Grade I. He opined:

> I think it is reasonable to consider having a posterior lateral interbody fusion with cages at L/5 S/1 level with screws at the pedicles at L/5 and S/1. As I mentioned to Ms. Wakham she has a 75% chance of her pain improving. She has about an 18% chance that the pain may not and about 1-2% that she may get worse in terms of stiffness or tingling of her feet as a result of the surgery... I consider her symptoms to be related to the accident of 2000 with the diagnosis of dormant spondylolisthesis Grade 1 aroused by the accident of 2000, currently symptomatic.

(Tr. at 127.)

On March 23, 2005, Dr. Caraway stated:

> We had also tried to change her over from Lortab 10 mg tablets, which she came in to me taking four times daily. This is an inappropriate amount of hydrocodone. Unfortunately, Workers' Compensation fund ignorantly denied an appropriate changeover to a long-acting opioid based on Title-85. Of course, this was a misinterpretation of the meaning of Title-85, which deals with acute and not chronic pain. Furthermore, studies clearly show that long-acting medications reduce dose escalation and improve sleep scores. Nonetheless, I cannot fix the Workers' Compensation system despite my multiple attempts at doing so. We will keep her on her current medications of Lortab and recommend that she continue with the surgical suggestions as recommended by Dr. Ignatiadis.

(Tr. at 334.)

The record contains treatment notes from Allen Young, M.D. covering treatment from June 22, 2004 to December 11, 2006. (Tr.

at 276-307, 345-48, 346, 375-89.)

On November 22, 2005, Dr. Young noted that Claimant "is slurring her words some today and has been on the phone lately. Her husband... thinks there may be something wrong with her Tegretol and she may have had another stroke...Gary is not working right now and is with her every day." (Tr. at 346.)

On September 19, 2005, Dr. Young noted Claimant's primary complaint was pain in her lower lumbar region of the spine. He noted:

> She has seen Dr. Ignatiadis and he suggested fusion to help her. She has seen Dr. Schmidt last week and he agreed she would be helped with surgery. Her neurologist has released her in regard to her stroke to go ahead with the lower back surgery. She wants to pursue this now. She is tired of dealing with the pain. She is still seeing Dr. Caraway at the pain clinic who writes her Lortab. WVWCC has recently stopped paying for it and she has no $$. She is not taking anything right now and suffering...In regard to her lumbar fusion, she is ready to have her fusion procedure and she wants to see Dr. Schmidt to do that. I am requesting authorization for her to see Dr. Schmidt again and discuss this and get authorization for the surgery... In regard to denying her pain meds, she has been on pain meds chronically since 2000, because she has chronic pain as a result of her compensable injury. Please approve her pain meds.

(Tr. at 277-78.)

On July 25, 2005, Dr. Young noted:

> This is her first recheck since after being admitted to the hospital in April after suffering a stroke and resulting seizure. That has since been resolved, but she and her husband say she is still left with some intermittent confusion and problems concentrating... She continues to have the lower back pain and stiffness... She is out of her Xanax and her Lortab right now and her blood pressure is up today-she attributes that to being

12

out of these meds.

(Tr. at 279.)

On April 29, 2005, Dr. Young noted:

Dr. Caraway, pain clinic, is writing her Lortab.  She is
taking Robaxin from me.  She is relatively stable on
these meds, but still has a lot of pain and that is why
Dr. Ignatiadis is going to do a fusion procedure.  In
regard to her worsening depression, she has started the
Prozac and that has helped.  She has seen Dr. Fink and
she says that has helped as well.  He is increasing her
Prozac dose.

(Tr. at 282.)

On evaluation notes dated April 4, 2005, and February 28, 2005

Dr. Young stated:

Her main problem today is that her depression continues
to get worse...She has had fits of rage and she is asking
me to help her with this.  She cannot sleep even on the
Halcion from her FP.  She says she went to her husband's
office the other day and "cussed everyone out"... I do
not treat depression, but I am going to get her started
on Prozac right now to help her for the time being, but
I will need authorization for her to be treated by a
psychiatrist (Dr. Fink) and to have continued treatment
for the mood disorder on her claim by him.

(Tr. at 286-87, 288-89.)

On April 23, 2005, Dr. Young noted "She is going to continue

on her current meds as per the pain clinic and our office.  I have

rewritten the Prozac again today - I have told her she needs it and

should pay for it if WVWC does not and we can work the particulars

out later.  It is only about $15 I think for the month."  (Tr. at

285.)

On evaluation notes dated December 30, 2004 and November 4,

2004, Dr. Young stated: "Her symptoms are basically the same and there has been no new injury... The Robaxin has been helping some. She continues to use Lortab from Dr. Caraway as well.  He has said he does not think more epidural shots will help much."  (Tr. at 291, 294.)

On evaluation notes dated October 7, 2004, and August 26, 2004, Dr. Young stated: "Her symptoms are basically the same and there has been no new injury." (Tr. at 297, 299.)  He noted Claimant had recently seen Dr. Caraway again and that he has done three epidural injections "with no significant relief."  (Tr. at 299.)

Treatment notes from Dr. Young dated June 22, 2004, indicated Claimant was a patient referred from Dr. Vigo for a work related injury to the lower back.  Dr. Young stated:

> The patient has been evaluated by neurosurgery and is a
> surgical candidate (Ignatiadis, M.D. in 2001).  She has
> had physical therapy.  After PT, she was not improved.
> The patient has been treated by pain management (St.
> Mary's).  Pain clinic therapy consisted of a series of
> epidural injections.  This has made the condition the
> same.

(Tr. at 306.)

On July 18, 2005, John H. Schmidt, III, M.D. evaluated Claimant at the referral of Allen Young, M.D. for a second opinion regarding posterior interbody fusion for spondylolisthesis Grade II L5-S1. He advised Claimant as the risks of the surgery and addressed her questions. (Tr. at 390-93.)

14

On November 19, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFCA") and opined that Claimant could perform light work with the ability to occasionally climb ramp/stairs, stoop, and kneel, and to never climb ladder/rope/scaffolds, balance, crouch, or crawl. The evaluator found no manipulative, visual, or communicative limitations. Environmental limitations were unlimited except to avoid concentrated exposure to extreme cold and extreme heat, to avoid even moderate exposure to vibration, and to avoid all exposure to hazards. (Tr. at 308-15.) The evaluator, M. G. Lambrecht, M.D. noted:

> Her symptoms seem partly credible. What surprises me is that she may well have new onset of seizures. However, she was on a variety of drugs and there is a question of drug induced seizure. Nevertheless, she is on Tegretol and has not had another one. As for her back, she may require surgery. She has had injury in back in June 2000, and has complained of pain ever since. RFC is reduced.

(Tr. at 313.)

On May 2, 2005, Claimant was admitted to St. Mary's emergency room due to a seizure. The admission form states:

> Apparently, Mrs. Wakham has had a long history of anxiety and depression saw Dr. Fink 2 or 3 weeks ago for Workers' Comp. She was started on Prozac 20 mg daily and was told to gradually increase the dose to 40 mg a day, but apparently, she had taken an extra dose up to 60 mg for an unspecified number of days. However, according to the bottle, there were 24 pills a day or two ago, now there are 12. [t]hese were counted by her husband who is a pharmacist. She apparently had around 7:30 a generalized tonic/clonic seizure and bit her lip... She was seen by one of the psychiatrists downstairs and thought she was

not a suicidal risk...Her EKG showed sinus tachycardia at 143.  CT scan of the head was negative.

(Tr. at 229-30.)

On May 3, 2005, Ronald E. Barebo, M.D. evaluated Claimant at St. Mary's and made the following consultation notes:

> Evidently the patient was started on Prozac approximately one month ago.  Recently she was instructed to go up on her dosage but reportedly she was taking extra dosages of her Prozac.  The patient states that she was taking two pills twice a day.  Her husband states that she got her prescription filled on April 26, 2005 and had 30 pills at that time.  On admission, he states that he counted her pills and there were only 12 left in the bottle...Urine drug screen is positive for benzodiazepines, otherwise negative.  Alcohol is not detected.  Interestingly, her opioid level was negative despite supposedly being on Lortab 10 mg 4 times a day.  CT scan of her head on admission, is negative.  Impression: 1.  New onset seizure activity.  This may very well be related to Prozac, especially if she was indeed taking extra dosages as this can lower one's seizure threshold.  She was also sleep deprived.  2. Anxiety/depression.  3. Chronic low back pain, being followed by Dr. Ignatiadis for possible surgical intervention. Disposition: The patient's Prozac has been discontinued...At the present time, I will not start her on any anticonvulsant medications.  I will set her up for a MRI scan of her brain.  Her EEG showed no epileptiform discharges.  She was told of seizure precautions.

(Tr. at 232-34.)

On May 5, 2005, Dr. Barebo interpreted an electroencephalogram ("EEG") of Claimant.  He found: "This EEG contains an excessive amount of beta activity which can been seen in patients taking benzodiazepines and barbiturates.  There are no epileptiform discharges noted."  (Tr. at 266.)

On May 5, 2005, the final diagnosis at discharge from St.

16

Mary's was: "1.   New onset seizures possibly secondary to Prozac excess or possibly associated with abnormal MRI lesion in the left frontal lobe.   2.   Chronic anxiety with depression.   3. Hypokalemia? - resolved.  4.  Disabling low back pain.  5.  History of hyperlipidemia."  (Tr. at 225.)   The discharge summary of David L. Patick, M.D. stated:

> Resume same home medications except I had asked her to stop the appetite suppressant.  Stop Prozac.  Tegretol added 200 mg. b.i.d. ...History of Present Illness and Hospital Course...She has been depressed and was seen by Dr. Fink as part of Workers' Compensation and was placed on Prozac and she may have taken some excessive doses inadvertently and was up to 60 to 80 mg of Prozac a day. She developed a witnessed generalized tonoclonic seizure, bit her lip and became unresponsive.   At the time of presentation she had hypokalemia.  She was treated with intravenous oral potassium.  She had an EEG that was negative.  However, MRI showed a hyperintense area in the left frontal region that did not contrast enhance with gadolinium by Dr. Barebo.  She underwent a lumbar puncture that was unremarkable.  Some other studies are still pending including antiphospholipid antibodies, angiotensin converting enzyme and oligoclonal bands.  She was hemodynamically stable at the time of discharge.  She was started on Tegretol by Dr. Barebo.  She will be followed up by Dr. Barebo's office in a couple of weeks in view of the seizures and was told not to drive.

(Tr. at 225-26.)

On June 1, 2005, Dr. Barebo evaluated Claimant as follow-up to her hospital admission for a seizure.  He found:

> She was thought to have taken extra doses of Prozac, which may have been a contributing factor.  An MRI scan of her brain was performed which showed an abnormality in the left frontal region.   There is no contrast enhancement.  It is unclear whether this represented ischemia, versus neoplastic process.  She underwent an outpatient PET scan which showed no evidence of neoplasm. She has since undergone an echocardiogram and carotid

17

duplex study which were normal.  She had antiphospholipid antibodies done in the hospital which were negative.  She also underwent a lumbar punctuer that did show mild elevation of protein as well as some oligoclonal bands but no evidence of myelin basic protein.  The remainder of the studies were negative.  Her EEG showed no abnormalities.  Angiotensin converting enzyme and ANA were negative.

Interestingly, on her discharge summary from Dr. Patrick, he reports that the patient was instructed to stop her appetite suppressant.  When I asked the patient about this, she states she was not taking any appetite suppressants at the time of her seizures.  She does admit that she had taken something in the past, but was unable to tell me what the name of it was and when she actually had taken it. According to both she and her husband, she just took this sporadically.  The patient did undergo blood work on 5-28-04 including CBC, metabolic profile and Tegretol level.  Her CBC and metabolic profile were within normal limits.  Her Tegretol level is as of yet pending...

Since being out of the hospital she has had a couple of spells which may represent auras.  She tends to fade out but has not had any actual tonic clonic seizure activity. She has had significant psychological complaints with anxiety and depression and a fear of dying when she falls to sleep. She occasionally stutters and has some word finding difficulties...

I suspect much of Mrs. Wakham's current complaints are related to her underlying stress, depression and anxiety. She is having some spells, which may represent auras, however they may also be anxiety related...She will need a follow up MRI scan in three months from her previous study...I will see her back in four weeks for follow up.

(Tr. at 238-39.)

On July 18, 2005, Dr. Barebo stated that Claimant appeared to be improved and that he was scheduling her for a follow-up MRI scan of her brain for comparison.  (Tr. at 366.)

On September 13, 2005, Dr. Barebo evaluated Claimant and

18

noted: "Her follow-up MRI scan was normal.  She is currently on Tegretol 200 mg twice a day and is doing well.  She has had no further seizures... She wants to know if it is okay from a neurological standpoint for her to undergo surgery.  I told her as long as she stays on her medication I see no contraindication for her to undergo lumbar disc surgery."  (Tr. at 364.)

On November 15, 2006, Dr. Barebo stated that Claimant's "Tegretol level came back in the toxic range.  She is currently on Tegretol 200 mgs four times per day.  She was told to hold her medicine for two days and then decrease her dose down to 200 mgs three times a day."  (Tr. at 357.)  On November 14, 2006, Dr. Barebo stated Claimant was complaining of dizziness and vertigo. He noted some unsteadiness on gait testing.  He further noted that she has had no further seizure activity. (Tr. at 358.)

On August 17, 2006, Dr. Barebo stated that he worked the Claimant in for an appointment because she had called

> concerning a transient spell.  According to her husband, the patient had missed two doses of her Tegretol and two doses of her Xanax... There was no actual witnessed seizure activity... It very well was likely related to where she had missed her medication... I have recommended that she undergo an MRI scan of her brain with contrast. This will evaluate the previous abnormalities seen on her original MRI, as well as rule out any new lesions to explain her current symptoms.

(Tr. at 360-61.)

On May 30, 2006, Dr. Barebo noted that Claimant "has been seizure free now for years.  She is on Tegretol 200 mgs four times

a day.  She denies any significant side effects.  She is no longer seeing Dr. Fink for her depression.  Instead she follows with Dr. Patick."  (Tr. at 362.)

Progress notes from Dr. Patick of Ultimate Health Services cover the period from December 7, 2000 to November 14, 2006.  (Tr. at 237-58, 349-56.)  Dr. Patick's primary specialty is self designated as internal medicine.  (Tr. at 372.)

On November 14, 2006, Dr. Patick evaluated Claimant as follow-up for her chronic anxiety, depression, and seizures.  He reported that Claimant "has had no further seizures and is still on Tegretol and Dr. Barebo has given her Antivert as she was having some vertigo."  (Tr. at 349.)

On August 9, 2006, Dr. Patick evaluated Claimant because of a "[p]ossible seizure due to Xanax withdrawal or other reasons... She apparently was trying to get out of her car yesterday and became limp and had some postictal confusion, but there was no bowel or bladder incontinence, no tongue biting."  (Tr. at 350.)

On May 23, 2006, Dr. Patick evaluated Claimant regarding her history of seizure disorder, anxiety, and depression.  He noted: "She is a year out from seizures."  (Tr. at 351.)

On December 8, 2005, Dr. Patick evaluated Claimant and noted: "She is followed by Dr. Barebo for her seizures and cannot drive until May.  Her husband lost his job and it has been awfully stressful and she is quite emotional and they have to move back to

Gilbert."  (Tr. at 252.)

On September 8, 2005, Dr. Patick evaluated Claimant and noted "her husband got fired from his job and this has been emotionally difficult...She has been using a little more Lortab lately.  She sees Dr. Fink who has her on Lexapro... I have refilled her maintenance medicines and follow up with me in four months." (Tr. at 353.)

On June 2, 2005, Dr. Patick evaluated Claimant as follow-up to her hospital admission for a seizure.  He found Claimant had new onset seizures, chronic anxiety/depression, disabling pain, and insomnia.  He recommended that she "follow up with me in about three months and six months." (Tr. at 237.)

On May 5, 2005, Dr. Patick noted that he had consulted with Dr. Barebo and his final diagnosis was

> Generalized tonic clonic seizures, possibly related to Prozac excess prescribed by Dr. Fink, yet with an abnormal MRI showing a hyperintense area in the left frontal region without contrast enhancement, with a PET scan pending, and EEG being negative and lumbar puncture results negative with a negative ANA with other studies pending including antiphospholipid antibodies, angiotensin converting enzyme, et cetera.  Hypokalemia, on admission which responded to intravenous and oral potassium... Resume same home medications except: 1) Stop her appetite suppressant and Prozac.  2) Tegretol added at 200 milligrams twice daily.

(Tr. at 355.)

On February 15, 2005, Dr. Patick stated: "She has joined LA Weight Loss and is trying to trim down and feels better and she is hoping to go on a trip to Hawaii with her husband."  He refilled

21

her maintenance medications and instructed her to follow up with him in four months. (Tr. at 241.)

On June 2, 2004, Dr. Patick wrote: "She states she is involved with her son who is planning to go to second grade... and things have been active. She has not been taking appetite suppressant as regularly but needs some refills... I refilled her prescriptions... She will follow-up with me in four months." He refilled her maintenance medications and instructed her to follow up with him in four months. (Tr. at 241.)

On February 2, 2004, Dr. Patick noted:

> She states she has a new drug plan with Cigna and needed 34 day supplies. She is compliant with her other medications... She has been out of the Xanax for about 3 days and is having a "panic attack" now and needed something. She still has diminished sex drive and wanted something for this... She wanted a diet sheet and I have given her a 1200 calorie ADA low cholesterol diet...Follow up with me in about four months. I refilled maintenance medications. She is to follow up with Dr. Clark concerning any sexual problems.

(Tr. at 244.)

On October 30, 2003, Dr. Patick wrote: "She has gained some extra weight and she is going to try and work out... I refilled prescriptions and went over the flow sheet...follow up in three months." (Tr. at 245.)

On July 29, 2003, Dr. Patick noted: "She is looking forward to going to Topsail Beach coming up this summer. She wants to know if she can take an extra pain pill... She needs her maintenance refills and also she will need lab work at the time of follow up...

22

in 3 months."  (Tr. at 246.)

On May 6, 2003, Dr. Patick wrote:

We did discuss the fact that she was getting Soma from
her dentist and Lortab from Workers' Comp doctor and she
realized that this was a mistake, getting drugs from
multiple providers.   She has been turned down for
Disability twice and she has sought legal action and
hopefully she will get her full Disability.   I stated
that I would be happy to write her prescriptions for her
as long as I am the sole prescriber of her controlled
substance medication.   She states that she would even
consent to drug testing if need be... I refilled her
prescriptions and went over them carefully... Follow up
with me in about three months.

(Tr. at 247.)

On January 21, 2003, Dr. Patick noted:   "She needs some

refills and wanted to try the appetite suppressant that her husband

tries.  She is comfortable in a size 10 now and would like to lose

a few more pounds.   She states her son is doing well in

kindergarten... Follow up with me in about three months." (Tr. at

248.)

On October 16, 2002, Dr. Patick wrote:

She states, she feels better on Xanax and wanted to go
back on this.  She has trimmed down 10 pounds and went
down from a size 16 to a size 12.  She said, since her
son is enrolled in Kindergarten, things are working out.
She has had a recent cold and congestion and she wanted
some antibiotics, and also something for cough... follow
up with me in three months.

(Tr. at 249.)

On September 17, 2002, Dr. Patick noted:

She states she may [be] becoming immune to the Xanax and
since her husband takes Valium, she wanted a trial of
this.  She quit her job for MSN working in Lexington.

23

> She will be moving back to Barboursville so her son can
> be enrolled in that school system.  She still has chronic
> low back pain with right sided referral and had an MRI of
> the lumbar spine recently that showed no herniated discs
> or spinal stenosis but a lot of degenerative disc spurs.
> She still has occasional panic attacks and sighing
> respirations... I refilled her prescriptions... switched
> her to Valium... follow up with me in three months.

(Tr. at 250.)

On April 24, 2002, Dr. Patick wrote:

> She did slip and fall, as her dining room chair had
> collapsed a few months ago and I wrote her a note and
> apparently she injured her back.  She did get a Workers'
> Compensation claim for 13% which helped out.  She is
> still run-down, etcetera.  I stated I didn't feel
> comfortable prescribing Soma because of its addictive
> potential and she is wanting to continue with Robaxin...
> I refilled her prescriptions... follow up with me in
> three months.

(Tr. at 251.)

On January 23, 2002, Dr. Patick noted: "She wanted a generic

muscle relaxer and we switched her from Skelaxin to Robaxin... I

refilled the prescriptions... follow up with me in three months."

(Tr. at 252.)

On October 24, 2001, Dr. Patick wrote: "She needs refills on

all of her prescriptions... follow up with me in three or four

months."  (Tr. at 253.)

On July 23, 2001, Dr. Patick noted:

> Tonya is here for follow up regarding her low back pain
> and anxiety/depression.  She states she stopped the
> Celexa after a short while but after her step-son was
> killed in a motor vehicle accident in Tennessee she
> restarted it and seems to be coping with the situation.
> She also wanted some more Soma as she is having more
> muscle spasms.  Her husband had used some of her Ambien

24

> making her "short."   She is having a lot of stress
> dealing with the situation.  The funeral for the step-son
> was  apparently  on  July  9th...  I  refilled  her
> prescriptions... Follow up in three months.

(Tr. at 254.)

On April 27, 2001, Dr. Patick noted:

> She is taking some Soma which has helped out as a muscle
> relaxant.  She is somewhat tearful because one of her
> aunts who is only fifty-six is dying of metastatic
> pancreatic cancer and it is difficult for her to deal
> with.  She has had a lot of emotional stress and it is
> sometimes difficult to concentrate and work.  The Lortab
> 10 is helping out her generalized aches and pains.  In
> regard to her depression she took Prozac in the past but
> she gained weight and it cut her sex drive.  She took an
> extra dose of Xanax and it seemed to help out... I
> refilled her prescriptions and increased her Xanax...
> follow up with me in about a month.

(Tr. at 255.)

On February 2, 2001, Dr. Patick treated Claimant for fatigue and general medical problems.  He wrote: "She states she is having no trouble with the Fastin and blood sugar but she has done real well and has trimmed down without adverse reaction... Weight: Down about twenty pounds to 156... I refilled her prescriptions... Follow up with me in two months."  (Tr. at 256.)

On December 7, 2000, Dr. Patick evaluated Claimant for the first time.  He wrote:

> Chief Complaint: The patient desires to be established
> with a primary care doctor... She has had chronic low
> back pain involving L5-S1 and takes Lortab... She has
> gained a lot of weight and would love to get down to 135
> pounds... She had been using Fastin per her prior family
> physician and did lose weight and this was more
> successful than Tenuate.
> Current Medications:

25

```
1.  Xanax .5 mg b.i.d. p.r.n.
2.  Flexeril 10 mg b.i.d.
3.  Ambien 10 mg q.h.s. p.r.n.
4.  Lortab 7.5 mg b.i.d. p.r.n....
```
Recommendations:
```
1.  I have refilled all of the prescriptions and added
Fastin.
2.  Follow-up with me in two months... I would encourage
her to increase exercise tolerance and watch her fat
grams and sweets, etc.
```

(Tr. at 257.)

Psychiatric Evidence

On August 6, 2002, Claimant was treated at Community Health Foundation Clinic ("CHFC") for "clinical depression." (Tr. at 184.) Tomas Vigo, M.D. stated that Claimant "requests a prescription for Celexa. She states she took Celexa a few years ago with good relief of the symptoms." (Id.) Dr. Vigo states that "[p]atient signed a narcotic contract." (Tr. at 185.)

On September 11, 2002, Claimant was treated at CHFC. Dr. Vigo diagnosed Claimant with "lumbar sprain, bulging disc L5-S1, situational depression." (Tr. at 181.) Dr. Vigo states Claimant would like to be referred to a psychiatrist and has a referral to Dr. Ignatiadis, a neurosurgeon. (Id.) Later in his report, Dr. Vigo again refers to Claimant's depression as "situational." (Tr. at 182.)

On October 9, 2002, Claimant was treated at CHFC. Dr. Vigo diagnosed Claimant with "lumbar sprain, bulging disc L5-S1, situational depression." (Tr. at 179.) Dr. Vigo states that Claimant has requested that she "be placed on Lortab." (Id.)

26

Later in his report, Dr. Vigo again refers to Claimant's depression as "situational." (Tr. at 180.)

On December 4, 2002, Claimant was treated at CHFC. Dr. Vigo diagnosed Claimant with "lumbar sprain, bulging disc L5-S1, situational depression." (Tr. at 178.) Dr. Vigo states Claimant should return in sixty days. (Id.)

On January 3, 2003, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe. (Tr. at 142.) The evaluator, Joseph Kuzniar, Ed. D., based his opinions upon the medical disposition categories of Affective Disorders and Anxiety-Related Disorders. (Tr. at 142.) Dr. Kuzniar opined that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, maintaining concentration, persistence, or pace, with no episodes of decompensation. (Tr. at 152.) He stated that the evidence does not establish the presence of the "C" criteria of the listings. (Tr. at 153.)

On January 29, 2003, Claimant was treated at CHFC. Dr. Vigo diagnosed Claimant with "lumbar sprain, bulging disc L5-S1, situational depression." (Tr. at 177.)

On March 26, 2003, Claimant was treated at CHFC. Dr. Vigo diagnosed Claimant with "lumbar sprain, bulging disc L5-S1, situational depression." (Tr. at 174.) Dr. Vigo notes that Claimant has requested that she be referred to a psychiatrist.

(Id.)  Later in his report, he again describes her depression as
"situational."   (Tr. at 175.)   He also states: "Patient has
violated her narcotic contract.   Therefore, all narcotics have been
stopped." (Id.)   Dr. Vigo added an addendum to his report: "[t]he
pharmacist...informed me that she could not refill prescription for
Lortab because the patient had another prescription filled for 270
tablets of Lortab today from another physician.   This is a
violation of the contract signed by the patient on 10/9/02.   For
that reason all narcotics will be discontinued." (Tr. at 176.)

On May 27, 2003, Claimant was treated at CHFC.   Dr. Vigo
diagnosed Claimant with "lumbar sprain, bulging disc L5-S1,
situational depression." (Tr. at 172.)   He states "she requests to
be referred to a pain clinic in Huntington (as it is closer to her
home).   She requests a prescription for Trazodone." (Id.)   Later
in his report, he again describes her depression as "situational."
(Tr. at 173.)

On July 22, 2003, Claimant was treated at CHFC.   Dr. Vigo
diagnosed Claimant with "lumbar sprain, bulging disc L5-S1,
situational depression." (Tr. at 170.)   Dr. Vigo states: "She
requests to be referred to a psychologist for one-time consultation
(since WC has not approved consultation with psychiatrist).   She
has been referred for more physical therapy.   She has also been
referred to St. Mary's Hospital Pain Relief Center for pain
management." (Id.)   Later in his report, Dr. Vigo again describes

28

Claimant's depression as "situational" and prescribes Trazodone and Motrin.  (Tr. at 171.)

On September 25, 2003, Claimant was treated at CHFC.  Tomas Vigo diagnosed Claimant with "lumbar sprain, bulging disc L5-S1, situational depression."  (Tr. at 169.)

On February 23, 2004, Claimant was treated at the CHFC for "chronic low back pain and situational depression."  (Tr. at 168.) Dr. Vigo stated: "<u>Diagnosis</u>: Lumbar sprain, bulging disc at L5-S1 and situational depression.  <u>Plan</u>: Return in sixty days for follow up.  Letter to worker's compensation for authorization for physical therapy 3 x week x 12 more sessions and medication."  (Id.)

On February 23, 2004, Claimant was treated at the Community Health Foundation Clinic for chronic low back pain and depression. Progress notes state Claimant has been prescribed Lortab and Neurontin by the pain clinic.  (Tr. at 166.)  Dr. Vigo diagnosed Claimant with chronic lumbosacral strain, bulging disc at L5-S1 and depression.  He advised Claimant avoid heavy lifting and to return to the clinic in sixty days for follow up.  (Tr. at 166.)

On December 1, 2004, Kelly Robinson, M.A., Supervised Psychologist, and Lisa C. Tate, M.A., Licenced Psychologist, provided a psychological evaluation of Claimant.  The psychologists noted that claimant's grooming and personal hygiene were good, that she walked with a normal gait and maintained normal posture, that she had no apparent vision, hearing, or speech problems, and that

29

she drove herself to the interview unaccompanied.  (Tr. at 220.)
The evaluators noted Claimant was alert throughout the evaluation,
and oriented to person, place, time and date; observed mood was
dysphoric; affect was mildly restricted; thought processes appeared
logical and coherent; no indication of delusions, obsessive
thoughts or compulsive behaviors; no unusual perceptual
experiences; insight was fair; judgment within normal limits;
denied suicidal and homicidal ideation; immediate memory within
normal limits; recent memory within normal limits; remote memory
within normal limits; concentration within normal limits;
psychomotor behavior was normal; social functioning within normal
limits based on her interactions with the examiner and the staff;
attention/concentration within normal limits based on her score of
nine on the Digit Span subtest of the WAIS-III; persistence within
normal limits based on the MSE; and pace within normal limits based
on the MSE.  (Tr. at 222-24.)  Their diagnostic impression:

     AXIS I:     296.32      Major Depressive Disorder,
                             Recurrent, Moderate
                 300.00      Panic Disorder Without Agoraphobia
     AXIS II:    V71.09      No Diagnosis
     AXIS III:   By self report: back problems and right leg
                 numbness

(Tr. at 223.)  They concluded her prognosis was fair and that she
appeared capable to manage any benefits she might receive.  (Tr. at
224.)

     On April 20, 2005, Kenneth M. Fink, M.D., psychiatrist,
reported that he evaluated Claimant on April 11, 2005, at the

referral of her treating physician, Allen Young, M.D.  He stated

that Claimant's

> chief complaint (reason for being at office visit in her
> own words) was "been going off...belligerent for no
> reason with my son and husband."... She reports that her
> husband has threatened her for years to divorce her
> because she has gained weight and during my interview,
> she began to weep, sob and cry.  Her memory appears
> intact, intellectual functioning is in the normal range.
> There is no evidence of psychosis, delusions,
> hallucinations or mania.  She evidences fair insight,
> intact judgement and normal eye contact... She complains
> of depression, anxiety, back pain, marriage concerns
> given conflict with her husband.  She describes impaired
> libido, as well as constipation from all of her
> medications.  Eye contact is good... My psychiatric
> diagnostic assessment is that Mrs. Wakham shows signs and
> symptoms of Major Depressive Disorder, Recurrent,
> Unspecified Type (296.30) along with Anxiety Disorder,
> NOS (300.00) in part due to her work related injury as
> ascertained by her referring and treating physician,
> Allen Young, M.D.

(Tr. at 342-43.)  He recommended that Claimant receive

psychotherapy and medication management on a monthly basis for

twelve months. (Tr. at 343.)

On June 22, 2005, Randall Short, D.O., Reviewing Medical

Physician for the West Virginia Worker's Compensation Commission,

Office of Medical Management, recommended that Claimant's request

for psychotherapy and medication management be denied because

Claimant "had significant history of depression prior to the injury

and had ongoing marital problems with threats by her husband that

he would divorce her... claimant suffered significant major

depression, as well as anxiety, prior to the injury of 06/12/00."

(Tr. at 344.)

On December 2, 2005, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant had affective disorders and anxiety-related disorders, with "[i]mpairment(s) not severe." (Tr. at 316.) Claimant had a mild degree of limitation in restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 326.) The evidence did not establish the presence of the "C" criterion. (Tr. at 327.) The evaluator, Timothy Saar, Ph.D., licensed psychologist, found

> Claimant's statements regarding her FC [functional capacity] on the ADL [activities of daily living] form are partially credible regarding m/c [mental capacity]. CE [claim evaluator] found all WNL [within normal limits]. ADLS [activities of daily living] limited due to physical problems. Mild limitations in social interactions. The evidence does not support severe limitations in FC [functional capacity] due to a mental impairment. Decision - impairment not severe.

(Tr. at 328.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ concluded Claimant did not have a severe mental impairment. (Pl.'s Br. at 5-8.) Claimant argues that this conclusion was reached because the ALJ was "substituting his opinion for that of the medical expert." (Pl.'s Br. at 5.) Claimant further asserts that the ALJ erred in assessing Claimant's credibility. (Pl.'s Br. at 8-11.) Again,

Claimant argues that this conclusion was reached because the ALJ "substitute(d) his own opinion for that of the doctors." (Pl.'s Br. at 10.)

The Commissioner argues that the ALJ's findings are supported by substantial evidence and should be affirmed because the medical evidence supports the ALJ's conclusion that Claimant's mental complaints do not rise to the level of a severe impairment and that Claimant's physical complaints are not disabling. (Def.'s Br. at 7-9.)

Severe Mental Impairment and Alleged ALJ Bias

Claimant first asserts that the ALJ erred in finding that Claimant's mental impairments are not severe. Claimant argues that the ALJ's finding is contrary to "the opinion of the medical experts in this case who diagnosed the claimant with major depressive disorder, recurrent, moderate, and panic disorder without agoraphobia and Kenneth Fink, M.D., who also felt she had a major depressive disorder, recurrent, anxiety disorder, NOS, at least partially related to her chronic pain." (Pl.'s Br. at 12.) Claimant further asserts:

> The ALJ in this case appears to be substituting his opinion for that of the medical expert in that he alone mentions situational anxiety. The medical experts who examine her mention conditions that are of sustained length. Dr. Fink even states that he thinks she needs a year of future treatment. (TR 343) Further, the medical experts who determined that Ms. Wakham did not have a severe impairment did not have access to Dr. Fink's report – no reference in the Consultant's notes to Dr. Fink. (TR 328) Further, the other medical experts in the

case who evaluated the claimant psychologically were
psychologists not psychiatrists like Dr. Fink.

(Pl.'s Br. at 5-6.)

When evaluating a claimant's mental impairments, the Social
Security Administration uses a special sequential analysis outlined
at 20 C.F.R. §§ 404.1520a and 416.920a. First, symptoms, signs, and
laboratory findings are evaluated to determine whether a claimant
has a medically determinable mental impairment. §§ 404.1520a(b)(1)
and 416.920a(b)(1)(2006). Second, if the ALJ determines that an
impairment(s) exists, the ALJ must specify in his/her decision the
symptoms, signs, and laboratory findings that substantiate the
presence of the impairment(s). §§ 404.1520a(b)(1) and (e),
416.920a(b)(1) and (e)(2006). Third, the ALJ then must rate the
degree of functional limitation resulting from the impairment(s).
§§ 404.1520a(b)(2) and 416.920a(b)(2)(2006). Functional limitation
is rated with respect to four broad areas (activities of daily
living, social functioning, concentration, persistence or pace, and
episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3)
(2005). The first three areas are rated on a five-point scale:
None, mild, moderate, marked, and extreme. The fourth area is
rated on a four-point scale: None, one or two, three, four or more.
§§ 404.1520a(c)(4) and 416.920a(c)(4) (2006). A rating of "none"
or "mild" in the first three areas, and a rating of "none" in the
fourth area will generally lead to a conclusion that the mental
impairment is not "severe," unless the evidence indicates

otherwise.  §§ 404.1520a(d)(1) and 416.920a(d)(1) (2006).  Fourth,
if a mental impairment is "severe," the ALJ will determine if it
meets or is equivalent in severity to a mental disorder listed in
Appendix 1.  §§ 404.1520a(d)(2) and 416.920a(d)(2) (2006).  Fifth,
if a mental impairment is "severe" but does not meet the criteria
in the Listings, the ALJ will assess the claimant's residual
functional capacity.  §§ 404.1520a(d)(3) and 416.920a(d)(3) (2006).
The ALJ incorporates the findings derived from the analysis in the
ALJ's decision:

> The decision must show the significant history, including
> examination and laboratory findings, and the functional
> limitations that were considered in reaching a conclusion
> about the severity of the mental impairment(s).  The
> decision must include a specific finding as to the degree
> of limitation in each of the functional areas described
> in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2006).

In the decision, the ALJ articulated his findings as to
functional limitations resulting from Claimant's depression and
anxiety:

> With respect to psychological complaints, as has been
> alleged by the claimant, although the actual diagnoses
> have differed somewhat, the medical evidence nonetheless
> indicates that she has been diagnosed with both anxiety
> and depression (Exhibits 5F, 6F, 9F, 10F, 11F, 12F, 18F,
> 19F, 21F, 22F, and 31F).  While the evidence reveals that
> these problems have been longstanding, the claimant
> reports a fairly significant and progressive worsening in
> intensity of her symptoms correlating with her physical
> problems stemming from a work-related back injury
> sustained in June 2000 (Exhibits 1E, 3E, 19F, and
> Testimony).  Although the claimant has never been
> psychiatrically hospitalized, she has received outpatient

35

psychotherapy treatment previously, albeit rather limited (Exhibits 9F and 18F).  The claimant's statements with respect to this prior treatment have been somewhat inconsistent, ranging from six months in length to one year on occurring in 1995 to 1997 as revealed in accounts given to Lisa Tate, M.A., state agency psychological consultative evaluator, and Kenneth Fink, M.D., evaluating psychiatrist (Exhibits 9F and 18F).

During the earlier evaluation of Ms. Tate on December 1, 2004, the claimant alleged a history of anxiety and depression since 1997 for which she received six months of counseling before "getting better" and stopping treatment (Exhibit 9F).  The claimant complained of progressively worsening symptoms including depression, anxiety, panic attacks occurring on average of twice a week, sleep disturbances, withdrawal from usual activities, and increase in both appetite and weight, during the prior three to four years (i.e. 2000 to 2001)(Id.)  Clinically, however, other than a dysphoric mood, mildly restricted affect, and fair insight there were no deficits noted in the claimant's functioning (Id.).  Ms. Tate found the claimant's judgement, memory, concentration, persistence, pace, psychomotor behavior, and social interaction to be within normal limits and she exhibited no signs of delusions, unusual perceptions, illogical or incoherent thoughts (Id.).  Diagnoses of major depressive disorder, recurrent, moderate, and panic disorder without agoraphobia were rendered (Id.)

During the one-time evaluation of Dr. Fink on April 11, 2005, the claimant alleged "having major depression" causing her to not feel like cleaning house, grocery shop, bathe, or want to get up out of bed (Exhibit 18F).  The claimant also complained of memory problems, "going off" and being belligerent with her son and husband, and episodes of crying for no apparent reason (Id.).  She admitted to one year of counseling in 1995 for marital problems (Id.).  As was noted during Dr. Tate's evaluation, she displayed a sad and depressed mood and anxious appearing and tearful demeanor during the examination (Id.).  Yet, her memory, cognitive functioning, and judgment were intact and there were no indications of psychosis, delusions, hallucinations, or mania (Id.)  Dr. Fink rendered diagnoses of major depressive disorder, recurrent, anxiety disorder, not otherwise specified, which he deemed to be at least in part to chronic pain (Id.).

36

> Similar complaints are revealed in treatment records of the claimant's current treating practitioners, Allen Young, M.D., general practitioner, and David Patick, M.D., internist, as well as various of the claimant's former treating physicians and consultative medical experts (Exhibits 11F, 12F, 19F, 20F, 21F, and 31F). However, despite that the claimant continues to take psychotropic medication (Xanax and Trazadone) there is no indication of significant limitations of a prolonged duration in her functioning aside from situational stress stemming from the ill health of an aunt, the unexpected and sudden death of her stepson, marital relational problems, and financial stressors due to her husband losing his job (Id.).
>
> After a thorough review of the entire record, the undersigned finds that the claimant's medically determinable mental impairments, considered singly and in combination, do not cause significant limitation in her ability to perform basic mental work activities and are therefore are (sic) "nonsevere." In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1)... Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1)."

(Tr. at 17-19.)

The court notes the Claimant's assertion that the ALJ "appears to be substituting his opinion for that of the medical expert in that he alone mentions situational anxiety." (Pl.'s Br. at 5.) The court finds that this assertion is incorrect as the medical record shows that Tomas Vigo, M.D., Claimant's treating physician at Community Health Foundation Clinic, described Claimant's depression at "situational" no less than fifteen times in records dated September 11, 2002 through February 23, 2004. (Tr. at 168-181.)

37

The court further notes Claimant's argument that the ALJ's conclusion was somehow flawed because "the medical experts who determined that Ms. Wakham did not have a severe impairment did not have access to Dr. Fink's report" (Pl.'s Br. at 5) to be unpersuasive. Under the regulations, more weight must be given to treating sources than to non-examining sources (20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006)). Here, however, Dr. Fink was a one-time evaluator, as was the State agency psychological consultative evaluator, Ms. Tate. Further, Dr. Fink's evaluative report was prepared on the basis of a single office psychiatric visit in relation to a Workers' Compensation claim. Thus, the court does not find the ALJ's consideration of mental impairment evidence to be problematic. Moreover, the ALJ's ratings of functional limitation were based on examination findings and Claimant's self-reported history in the record.

In short, the ALJ was justified in accepting the State agency source opinion that Claimant's mental impairments were not severe. In evaluating the "B" criteria, the ALJ concluded that Claimant had mild restrictions in activities of daily living, social functioning and concentration, persistence and pace and no episodes of decompensation, thus leading to a finding that Claimant's mental impairments are not severe. See 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1) (A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally

lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.). The ALJ's determination that Claimant's mental impairments were not severe is in keeping with the applicable regulations and is supported by substantial evidence , and the court proposes that the presiding District Judge so find. 20  C.F.R. §§ 404.1520a and 416.920a (2007).

While Claimant disagrees with the ALJ's findings cited above, the court has fully reviewed the record and finds that the ALJ's findings are supported by substantial evidence.  The conclusions drawn by the ALJ are reasonable, and the court can find no material misstatement by the ALJ in his findings demonstrating a personal bias against Claimant.

Credibility and Alleged ALJ Bias

Claimant next asserts the ALJ erred in assessing Claimant's credibility. (P. Br. At 8-11.)  Claimant argues that the objective evidence supports her subjective complaints of disability. (Pl.'s Br. at 10-11.)  Claimant states:

> When the ALJ reviewed the claimant's credibility he noted the following inconsistencies:  Although the MRI of the brain showed some signal abnormalities in the frontal lobe was suggestive of vasculities/ischemic changes, all subsequent work ups (different tests) were normal. (TR 21) This ignores in fact the PET scan which was found to be inconsistent with the MRI abnormality.  (TR 236) In fact these tests are to help narrow the diagnosis. Although all of these tests were negative, a year later she was still taking Tegretol and Dr. Barebo, who had started out suspecting her complaints to be related to her underlying stress, depression and anxiety (TR 239) later settled on a diagnosis of history of complex partial seizures. (TR 358)

The ALJ also noted that blood work taken at the time she was admitted to the ER for the seizures showed no opiods although she was supposed to be taking 4 lortabs a day... (TR 229) He then concluded that this lent further support to Dr. Barebo's suspicion of drug induced seizures - which it might had Dr. Barebo not decided first that the claimant's problems were related to stress/anxiety/ depression (TR 239) then complex partial seizures (TR 358). The person who was wondering about the medications was Dr. Patick, and even he was not certain in that she had new onset seizures possibly secondary to Prozac excess or possibly associated with abnormal MRI lesion in the left front lobe. (TR 225-26) Again the ALJ is trying to substitute his opinion for that of the doctors.

He also noted that physical examinations had not shown any muscle spasm, motor weakness, atrophy or difficulty posturing. (TR 23) The ALJ makes no effort to reconcile this statement with Dr. Guberman's findings that she [has] limitations in range of motion, and she was able to walk on heels, toes, walk heel to toe and squat but with difficulty. She could squat only half way and required assistance in arising from the squatting position. (TR 200). Then on February 11, 2005, Dr. Ignatiadis, a neurosurgeon, wrote a report in which he stated she had an inability to extend her back which was typical of spondylolisthesis. (TR 127)

(Pl.'s Br. at 10-11.)

The court finds that contrary to Claimant's assertions, the ALJ did not confuse Dr. Barebo's and Dr. Patick's comments regarding concerns of drug-induced seizures. The record shows that both doctors treated the claimant for adverse reactions to inappropriate use of prescription medication, including extra doses of Prozac, and missed doses of Tegretol and Xanax. (Tr. at 238-39, 350, 355, 360-61.) Additionally, the record shows that both doctors share the same medical practice, address, telephone and fax numbers. (Tr. at 350, 357.) Also, the ALJ fully discussed the

physical findings of Drs. Guberman, Ignatiadis, Caraway, and Allen. The ALJ explained either why he did not find their reports persuasive or how their reports supported a limitation to a range of light level work.  (Tr. at 24-25.)

Also, contrary to Claimant's assertions, a review of the ALJ's decision does not show a "substitution of his opinion for that of the doctors" but does show that he fully complied with the requirements of Social Security Ruling 96-8p that

> [i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.  For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.  The Ruling

further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ considered the evidence of record related to Claimant's impairments and concluded that while Claimant's chronic low back pain and seizures were severe impairments, she retained the functional capacity to perform a range of light work, such as office helper, counter attendant, order clerk, and receptionist. (Tr. at 17, 26)  He reasoned that Claimant's complaints were inconsistent with the objective medical evidence. (Tr. at 20-26)

42

The ALJ found:

albeit the evidence does not definitively establish that the claimant has abused her medications purposely, the undersigned notes indication in the records of David Patick, M.D., internal medicine specialist, dated May 6, 2003 that the claimant realized she had made a mistake by "getting drugs from multiple providers" simultaneously; and records of Dr. Vigo-Paredes dated March 26, 2003, reveal that she violated the narcotic contract by attempting to have two scripts for Lortab filled, one of which for 270 tablets, within two days of each other (Exhibits 5F and 10F). Perhaps most impressionable, is that such actions lends further support to Dr. Barebo's suspicions of drug induced seizures (Exhibits 10F, 11F, and 22F). Nevertheless, as there have been some abnormalities noted upon MRI imagining, the undersigned has taken this condition into account and made allowances for in the conclusions herein.

In reaching the conclusions herein, the undersigned has also considered all of the claimant's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 96-3p...

She reports constant and progressively worsening pain and stated she cannot get in and out of bed without assistance from her husband. She estimated that she can walk for thirty minutes, stand for ten, and sit for thirty minutes... With respect to her activities of daily living, the claimant testified that her husband helps her with everything, helps her get in and out of bed and helps get their son ready for school. She generally spends her day lying on a heating pad...

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but finds the credibility of the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms to be only fair. In addition to the inconsistencies in the record with respect to the claimant's compliance with her

43

medications as discussed above, the claimant's allegations of such severe functional limitations to the extent that she cannot even get out of bed without assistance, are unsupported by the objective data. Physical examinations have not shown any muscle spasm, motor weakness, atrophy, or difficulty posturing (Exhibit 1F, 7F, 11F, 16F, 17F, 21F, and 32F). Further, the claimant alleges that she became "disabled" in June 2000 but admitted that she continued to work until July 2001, a year after she purportedly became totally disabled. Further, while she states that she is never pain-free and wants to have back surgery, she alleges that she cannot afford to have it done and has been fighting Workers' Compensation for two years, for approval of the surgery. Yet, treatment notes of Dr. Patick, her workers' compensation doctor, show that she settled her claim with a 15% disability award and absent evidence of a worsening of her condition since the settlement of the claim, it appears unlikely that there is any possibility of reopening the claim (Exhibits 7F and 12F). She does not currently use a brace, has not tried physical therapy treatment recently, and in fact, though she reports that her medications are of minimal help, this and the use of heat are the only modalities that she uses at the present time. Such actions are not what one would expect for an individual in such severe and unrelenting pain. Finally, although the claimant alleges severe anxiety problems, she does not receive any treatment other than psychotropic medication prescribed by her primary car physician, Dr. Patick. The undersigned acknowledges that the claimant alleges financial inability to pay for treatment but there is no indication that she has ever attempted to obtain assistance from any community based or state funded medical program. Based on all of the above, the undersigned finds the credibility of the claimant's statements to be less than fully credible and her subjective complaints are treated accordingly herein.

As for the opinion evidence, there have been no medical source statements provided by any of the claimant's treating physicians (Exhibits 1F, 11F, 12F, 21F, 22F, and 31F). In a letter dated December 18, 2002 addressed to Dr. Young wherein he was urging approval from workers' compensation for additional treatment and/or surgery, Dr. Ignatiadis indicates that the claimant's injuries are directly related to the June 12, 2000 accident and that "she remains symptomatic and incapacitated" (Exhibit 16F). This opinion has been considered; however, as the

44

claimant herself admitted that she returned to her prior job as a radiological technician where she continued to work for longer than a year, the undersigned finds Dr. Ignatiadis' conclusions to be unpersuasive and, thus, accords them little weight herein.  Throughout Dr. Vigo-Paredes' treatment records are recommendations to avoid "heavy lifting" (Exhibit 5F).  Similarly, following an independent workers' compensation medical evaluation in November 2004, Bruce Guberman, M.D. opined that the claimant's back condition, resulting in decreased motion of the spine and an antalgic limped gait warranted a 15% whole body impairment rating (Exhibit 7F).  A report completed by Dr. Bofill, M.D., who last examined the claimant in May 2002, reveals no physical abnormalities despite claimant's claims of a progressive worsening in her condition (Exhibit 6F).

(Tr. at 21, 23-24.)

While Claimant disagrees with the ALJ's findings cited above, the court has reviewed them and Claimant's testimony at the administrative hearing and finds that the ALJ's credibility findings are supported by substantial evidence.  The conclusions drawn by the ALJ are reasonable, and the court can find no material misstatement by the ALJ in his findings demonstrating a personal bias against Claimant.  Additionally, Claimant's largely conservative treatment and the lack of objective medical evidence supporting her subjective complaints, along with the other factors identified in SSR 96-7p, all counsel in favor of a finding that Claimant's subjective complaints are not entirely credible.

The court finds that the ALJ properly weighed Claimant's subjective complaints of pain and properly assessed Claimant's credibility and the combination of her impairments, in keeping with the applicable regulations, case law, and social security ruling

45

("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>,

474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

<u>  July 13, 2009  </u>
        Date

Mary E. Stanley
United States Magistrate Judge